Filed 3/3/23  P. v. Bejarano CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H047892 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. F1554600) |
| v. | |
| RODRIGO EDWARD BEJARANO III, | |
| Defendant and Appellant. | |

Defendant Rodrigo Edward Bejarano III was convicted of the felony murder of Robert Heiser, who was killed in his own bedroom.  On appeal, Bejarano contends that the evidence adduced at trial is consistent with the conclusion that codefendant Gerardo Cruz Cisneros[1] killed Heiser after the completion of a home-invasion robbery.  Bejarano contends that the trial court prejudicially failed to adequately instruct the jury on the aspects of the felony-murder rule applicable to such a scenario.  Further, Bejarano contends that the prosecution improperly failed to disclose impeachment evidence concerning the medical examiner who testified at trial.  Even if his conviction is upheld, Bejarano argues that his sentence to life in prison without the possibility of parole

_____

[1] Bejarano was tried jointly with Cisneros.  Both Bejarano and Cisneros were convicted of felony murder, burglary, and robbery.  Bejarano and Cisneros filed separate appeals.  A different panel of this court affirmed Cisneros's convictions.

violated the guarantee of equal protection secured by the federal and California Constitutions. Finally, Bejarano contends that the trial court improperly imposed a $300 parole revocation restitution fine and a $129.75 criminal justice administration fee. We reverse the imposition of the fine and the fee and otherwise affirm the judgment.

## I. BACKGROUND

### A. *The Information*

The Santa Clara County District Attorney charged both Bejarano and Cisneros with (1) murder (Pen. Code, §§ 187, 190.2(a)(17))[2] committed in the commission, attempted commission, and/or immediate flight after felony robbery (§§ 211 and 212.5) and burglary (§ 459, 460(a)); (2) first degree robbery of an inhabited dwelling, voluntarily acting in concert (§§ 211-213(a)(1)(A)); and (3) first degree burglary (§§ 459, 460(a)).

### B. *Trial Evidence*

Law enforcement identified four people who, in their view, shared responsibility for Heiser's death—Bejarano, Cisneros, Isabella Chaidez, and Gabriela Ortiz. Pursuant to a plea agreement, Ortiz testified at the trial. Her testimony was at the heart of the prosecution's case against Bejarano and Cisneros, neither of whom testified.[3]

#### 1. *Ortiz's Testimony*

Ortiz met Chaidez when both were in custody in juvenile hall. Post-release, the two became friends—Chaidez stayed in Ortiz's house about twice a week, and the two used drugs and drank alcohol together. Ortiz met Bejarano and Cisneros through Chaidez.

Chaidez, Bejarano, and Cisneros recruited Ortiz to assist them with home invasion robberies. Chaidez described a home invasion robbery that she had committed with

---

[2] Undesignated statutory references are to the Penal Code.

[3] Chaidez was neither a party nor a witness in the trial court proceedings.

2

Bejarano and Cisneros in Fremont. Chaidez met the victim online, then used drugs with him several times in person. On their final encounter, Chaidez slipped Xanax into his drink at his home. While he was incapacitated, Chaidez let Bejarano and Cisneros into the home, and Cisneros tied the victim up and punched him in the face. The three made off with electronics and $1,000. Chaidez encouraged Ortiz to help them meet men to target, telling her that she was pretty.

Chaidez, Bejarano, and Cisneros persuaded Ortiz to participate in a similar home invasion robbery in Oakland. Responding to an advertisement from a man seeking to "party and hang out with females and do drugs," Bejarano and Cisneros dropped Chaidez and Ortiz off at the man's home. Although the plan was for Chaidez and Ortiz to incapacitate the man then let Bejarano and Cisneros into the home, Ortiz balked. After several hours of drug use, they left the home without incident.

On February 15, 2015, Chaidez got ready at Ortiz's house for a "date" with Heiser. Chaidez said she was just going to have dinner with "an older man" she met online to warm him up for a future robbery. Even so, Bejarano, Cisneros, and Ortiz all went together to drop Chaidez off at an Olive Garden for the date. The plan, at the time, was to rejoin Chaidez after her dinner date and for the four to spend the evening together using drugs and drinking.

While waiting for Chaidez, Bejarano, Cisneros, and Ortiz smoked marijuana and ate fast food. At the same time, Cisneros and Ortiz began sharing a mixed drink containing a liter of vodka. Ortiz also took around two and a half Xanax pills. Ortiz had only taken Xanax once or twice before that, and Xanax tended to put her in "a dream state of mind" and make her "[s]lower, drowsy, forgetful. Like if I did something and I fall asleep, I wake up and I don't really recall everything."

After about two hours, Chaidez contacted the group telling them that Heiser was going to take her to his house, so they would meet her there. Chaidez did not yet know the address but told the group it was somewhere in Gilroy.

3

Due to the change in plans, Bejarano drove to a drug store, from which he and Cisneros stole white "fabric" or "cotton" gloves.  Bejarano then drove them to Gilroy to await further word from Chaidez.  Chaidez relayed the address and told them to she would open the door for them after Heiser fell asleep.  At that time, their plan was for Cisneros to tie Heiser up so the group could ransack the house.  Over the course of about two hours of waiting, Ortiz and Cisneros finished the vodka mixed drink, Ortiz took another half pill or pill-and-a-half of Xanax, and the three smoked more marijuana.

Bejarano drove Cisneros and Ortiz to Heiser's address.  Heiser's house was located in a long driveway, which served multiple houses, off of a cul-de-sac at the end of Bay Tree Drive.  The end of the cul-de-sac was to the left of the driveway and across an open lot from Calle Del Rey.  While waiting for further instructions from Chaidez, Bejarano moved the car to Calle Del Rey, where it remained easily reachable on foot from Heiser's house.

When Chaidez texted that Heiser had fallen asleep and she was waiting for them at the end of the driveway, Bejarano, Cisneros, and Ortiz each did a key shot of crystal methamphetamine—a drug that would help Ortiz wake up—then left the car to meet Chaidez.

Chaidez led the group inside the home and directed Bejarano and Cisneros, both gloved, to the upstairs master bedroom where Heiser slept.  Chaidez handed Ortiz a bag, clothing, keys, and a purse and directed Ortiz to take a laptop and a wallet.  Chaidez went upstairs while Ortiz remained below to collect valuables, taking two champagne bottles in addition to the laptop and wallet.

After about five minutes, Ortiz heard Heiser scream and call for help.  Chaidez appeared from upstairs and, seeing that Ortiz was shaken, called her "a pussy" and directed her to put the bag in an SUV in Heiser's garage.  Ortiz complied but Chaidez went back into the house after failing to open the garage door to allow the SUV to exit. Ortiz heard no more noise from Heiser after the initial call for help.

4

Ortiz waited in the garage for another five minutes until the other three ran out of the house and told her to run to their car. None of the others had collected anything from the house. Ortiz grabbed the bag she had filled and ran with them out of the garage. Bejarano ran back to assist her as she struggled with the bag, and the four of them made it to the parked car.

As the group was getting into the car or immediately thereafter, Cisneros said that he had left a hat or a glove in the house and had to go back. Cisneros ran to the house alone and ran back to the car a short time later. Upon his return, Cisneros told the group that he had "punched [Heiser] one last time and put him to sleep."

While they were driving away, Chaidez, Bejarano, and Cisneros recounted for Ortiz the events in Heiser's bedroom. Bejarano said that Heiser cried out when Bejarano jumped from the doorway onto his back. Bejarano said that he sat on top of Heiser because it was hard to keep him still so he could be tied up. Cisneros said that in an attempt to pacify Heiser, someone told him, falsely, that they had a gun, but that Heiser responded by fighting more forcefully. Cisneros said that he punched Heiser, causing a nosebleed.

The group drove to a CVS or a Walgreens and then a 7-Eleven, where they tried to use Heiser's credit cards. Ortiz and Chaidez successfully obtained a prepaid card in the first store but their transactions were rejected in the second. From there, the group stopped at a gas station before meeting friends in the Alum Rock mountains to drink, smoke marijuana, and use crystal methamphetamine for a couple hours, by which time the sun had risen. The group then did laundry, sold the stolen laptop, and booked a room in a hotel the following evening, February 17, 2015.

In the hotel room, the group learned from the news that Chaidez was wanted for a burglary in Fremont and that a Gilroy man had been found dead in his home. Bejarano, Cisneros, and Chaidez attempted to persuade Ortiz to join them in leaving town, but at

5

her insistence they dropped her off at her house instead. Ortiz turned herself in to police the next day.

In talking with Gilroy police, Ortiz said initially that she learned what had happened in Gilroy only through word-of-mouth. Later Ortiz admitted that she had been in Gilroy but claimed to have remained in the car asleep. She identified the other individuals involved using their nicknames and said that those individuals had beaten Heiser badly because he was fighting back. She told law enforcement that Bejarano sat on Heiser because Heiser kept trying to get up. Ortiz ultimately admitted entering Heiser's home and stealing things. Ortiz was arrested and charged.

Pursuant to a plea agreement, Ortiz pled guilty to eight felonies—first degree robbery; voluntary manslaughter; burglary; assault with force likely to produce great bodily harm; attempted carjacking; false imprisonment; grant theft; and identity theft. The agreement spared Ortiz the potential for a sentence of life without parole, limiting her maximum sentence to 18 years and two months. The agreement required Ortiz to testify truthfully at the trial. The trial judge presiding over the proceedings was expected to sentence Ortiz after the trial and could impose a sentence below the maximum.

Although Ortiz described extensive substance use and little to no sleep on the night in question, inducing a "dream state of mind" during the central events, Ortiz testified that she could remember the critical events and only "little parts and pieces" of the events were missing from her memory. Ortiz denied that her references to her own drug use were intended to minimize her responsibility.

### 2. *Other Evidence*

The prosecution introduced evidence generally corroborating Ortiz's testimony about the Fremont incident. The victim from the Fremont incident described meeting

Chaidez online through Craigslist before she persuaded him[4] to take Xanax, after which he was tied up, beaten, and robbed by Chaidez and two or three unidentified men.

The prosecution introduced evidence generally corroborating Ortiz's testimony about the sequence of events on February 15, 2015. There was an Olive Garden bag with leftovers in Heiser's refrigerator. A waitress from the Olive Garden recognized only Chaidez and not Ortiz when shown photos of each. Heiser's credit card records reflected a transaction at Olive Garden on February 15, 2015, at 10:26 p.m. Cell phone data confirmed Bejarano's movements from the vicinity of the Olive Garden in San Jose to the vicinity of Heiser's home in Gilroy in line with Ortiz's timeline of events. A neighbor, awoken by her dogs barking, saw one individual running from Heiser's house in the direction of Calle Del Rey about 3:00 a.m.

Heiser's credit card records showed attempted transactions, the first successful and the next three declined, between 5:02 a.m. and 5:16 a.m. on February 16, 2015, at a CVS and a 7-Eleven in San Jose. Surveillance video from the CVS and the 7-Eleven showed Chaidez and Ortiz entering the stores at the time of the transactions. Surveillance video from a gas station about 5:53 a.m. on the same day showed Bejarano and Chaidez entering a gas station at which a purchase was made using the prepaid card from the CVS.

Surveillance video from the hotel showed Cisneros and Ortiz getting out of Bejarano's car and checking in at the front desk on the evening of February 17, 2015. Ortiz turned herself in by going to a police station in San Jose on the evening of February 18, 2015.

---

[4] At trial, the victim testified that although he initially told police Chaidez had drugged his drink, he in fact voluntarily took the Xanax at her encouragement. He initially lied because he was embarrassed. This differed from Ortiz's telling, in which Chaidez told Ortiz that she drugged the victim's drink. Based on this inconsistency, Cisneros's trial counsel argued that Ortiz had reviewed the police reports and was testifying based on their contents, rather than statements actually made to her by Chaidez.

Heiser's body was found face down on his bed with a charging cable around his wrists. One of Heiser's hands was only loosely bound. He had a bruise with a laceration above the right eye and there were additional bruises on the lower left chest, the inner left forearm, left side of the abdomen, the left hip, the belly button, and the right side of the abdomen. The bruising was recent. He also had a puncture wound on his upper lip, which Dr. Michelle Jorden, the medical examiner, opined was likely from Heiser's own tooth. Jorden identified petechial hemorrhaging in the oral mucosa, both eyes, and in the bruise on the right side of Heiser's abdomen. The petechial hemorrhaging indicated a lack of oxygen, consistent with being beaten and subjected to compressional asphyxia.

Jorden opined that Heiser's cause of death was "probable compressional asphyxia while being restrained in the form of bondage during a home invasion." However, Jorden elaborated that Heiser was subjected to "a physical assault where [he was] sustaining blunt head trauma. He has evidence of bruising to the head. He has evidence of abrasions to the face and he has a laceration. So there's blunt trauma to the head. And [at the same time] Mr. Heiser has a poor heart. He has a compromised heart. And there's evidence that he's [*sic*] an early right-sided heart failure based on the autopsy. [¶] So if someone is being restrained against their will and if they are sustaining injuries to their body, there's a pain factor that occurs. And when a -- when someone is in pain their heart rate increases. And when their heart rate increases, it increases demand [for] oxygen to the heart. [¶] Now, if the heart is not completely functioning up to par and you have the pain increasing the heart rate, a component of being scared or frightened that's all going to increase heart rate and further compromise the heart. So in this particular case there could be a simultaneous component of compressional asphyxia if someone is leaning into Mr. Heiser and compressing his chest where he can't adequately breathe and his heart is not getting enough oxygen and at the same time you're having the heart fail. . . . [¶] So there could have been predominantly a component of asphyxia by someone just sitting on Mr. Heiser because that is -- there's definite evidence of

8

asphyxia, but there's also a component that his heart might have given out. So it could have been asphyxia with a sudden cardiac arrythmia." Thus, Jorden noted "blunt force trauma" as an "other significant condition[]" because it "causes increased heart rate which would have impacted Mr. Heiser's dilated cardiomyopathy."

Pieces of white latex from a broken glove were recovered from Heiser's bedroom, including one piece pinned between Heiser's face and the bed, and were linked to Cisneros's DNA. Cisneros's DNA was also found on Heiser's hands, on Heiser's fingernail clippings, on Heiser's shirt,[5] on stains on the wall above Heiser's bed, and on the knob of the door leading from the house to the garage. The only item that contained DNA for which Bejarano was a possible contributor, together with Heiser, was a charging cable of unspecified origin collected from the driveway.

Cisneros called one witness, an expert who opined on the extent to which the drugs and alcohol Ortiz testified she consumed would have affected Ortiz's likely ability to recall the events of February 15 and 16, 2015. Bejarano did not call any witnesses.

In closing, Bejarano's trial counsel argued that the prosecution had not proven beyond a reasonable doubt that Bejarano entered Heiser's house. Bejarano contended that the only evidence suggesting he entered the house was Ortiz's testimony and that Ortiz was not a credible witness.

## C. *Conviction, New Trial Motion, and Appeal*

The jury convicted Bejarano and Cisneros of first degree murder, first degree robbery, and first degree burglary. As to the murder conviction, the jury found true the special circumstances that Bejarano and Cisneros "commit[ed] the murder while engaged in the commission of a burglary" and "robbery." As to the burglary conviction, the jury

---

[5] There was another contributor, aside from Heiser, in a sample collected from the lower back of Heiser's shirt. Testing ruled out Bejarano, Cisneros, and Ortiz. It is not apparent from the record whether a sample of Chaidez's DNA was obtained for testing purposes.

9

found that a person not an accomplice was present in the residence during the commission of the offense.

After the trial, the prosecution disclosed to Bejarano redacted versions of two internal memoranda from the District Attorney's office discussing interactions between Jorden and law enforcement. The unredacted text, which involved two cases in which children died under suspicious circumstances, contained an assertion that "Dr. Jorden . . . sees herself as an advocate for victim."

Bejarano moved for a new trial. In addition to challenging the adequacy of his trial counsel's representation, Bejarano argued that the Jorden memos were "crucial evidence" known to the prosecution, the non-disclosure of which violated the requirements of *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*). If the memos had been disclosed, Bejarano asserted that he would have sought to impeach Jorden as a "victim's advocate" who does not operate independently from law enforcement, and would have sought appointment of an independent medical examiner to evaluate Jorden's findings.

The trial court denied the new trial motion. As to the alleged *Brady* violation, the trial court reasoned that, considering the facts of this case in contrast to the cases addressed in the memos, the memos were not "exculpatory material that would have been material to any of the particular outcomes based on the charges that were before the jury, and that there has been no prejudice shown and that to the extent that . . . the information [had] been presented for potential impeachment, the Court likely would have done a balancing under the circumstances of this case and ruled that the material was not probative to [Jorden's credibility such that] it would have been proper for introduction when a balancing would have been conducted based on undue consumption of time, misleading the jury, or the risk of undue prejudice based on tangential issues."

After denying the new trial motion, the trial court sentenced Bejarano to life without the possibility of parole (LWOP) for his felony-murder conviction. The court imposed middle-term sentences of six years for the robbery conviction and four years for

10

the burglary conviction, both which it stayed pursuant to section 654. Among other fines, fees, and restitution, the court imposed a suspended $300 parole revocation restitution fine pursuant to section 1202.45 and a $129.75 criminal justice administration fee pursuant to Government Code section 29550.2.

Bejarano timely appealed. At Bejarano's request, we took judicial notice of judicial notice of the clerk's transcripts filed February 1, 2019, May 9, 2019, and August 7, 2019, in Cisneros's separate appeal under case number H046294.

## II. DISCUSSION

### A. *The Jury Instructions and the Response to Jury Question Number 1*

First, Bejarano argues that the trial court failed to adequately instruct the jury on the "in perpetration of" element of felony murder, in that it should have instructed, sua sponte, on the "one continuous transaction doctrine" and the "escape rule" in light of Ortiz's testimony that, after the group had reached their car, Cisneros returned alone to Heiser's house and "put him 'to sleep.' " Second, Bejarano contends that the trial court erred by failing to include an instruction listing factors that may be pertinent in assessing whether an individual acted with "reckless indifference to human life." Third, Bejarano contends that the trial court failed to adequately explain the significance of an individual juror's determination as to whether Bejarano was an actual killer to the felony murder analysis when it answered Jury Question Number 1 with a supplemental instruction. In this particular case, we conclude that (1) the trial court did not have an obligation to provide, sua sponte, the instructions that Bejarano now contends should have been given; and (2) the trial court provided an accurate and complete answer to Jury Question Number 1.

Anticipating our conclusion as to the trial court's duty to instruct on the theories he now argues, Bejarano alternatively contends that trial counsel rendered ineffective

11

assistance by failing to request the instructions he now seeks.[6] We conclude, however, that Bejarano has not demonstrated ineffective assistance of counsel through this direct appeal.

### 1. *Felony Murder*

Under the law in effect at the time of trial, the felony-murder rule held "those who commit the enumerated felonies . . . strictly responsible for any killing committed by a cofelon whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony." (*People v. Cavitt* (2004) 33 Cal.4th 187, 197 (*Cavitt*).) Effective January 1, 2019, the Legislature limited the scope of the rule. (See *People v. Lewis* (2021) 11 Cal.5th 952, 957.) Under current law, "[a] participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which death occurs is liable for murder only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section (d) of Section 190.2." (§ 189, subd. (e); see also *People v. Garcia* (2022) 82 Cal.App.5th 956, 964.) Thus, the requirements for felony murder liability under section 189, subdivision (e), now run parallel to the special circumstances requirements under section 190.2, subdivisions (b)-(d). (Compare § 189, subd. (e), with § 189, subds. (b)-(d).)

" '[T]he felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death.' (*Cavitt*, *supra*, 33 Cal.4th at p. 193.) The causal relationship is established by a 'logical nexus' between

---

[6] Bejarano also contends that trial counsel was ineffective because he failed to object to the trial court's response to Jury Question Number 1. Because we conclude that the trial court's response was appropriate, we need not address this argument separately.

12

the felony and the homicidal act, and '[t]he temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction.' (*Ibid*.)" (*People v. Wilkins* (2013) 56 Cal.4th 333, 346-347 (*Wilkins*).) "When the killing occurs during flight, . . . the escape rule establishes the 'outer limits of the "continuous-transaction" theory.' " (*Id*. at p. 345.) Pursuant to the escape rule, flight following a felony is considered part of the same transaction as long as the felon has not reached a "place of temporary safety." (See *id*. at pp. 343, 345.) " '[W]hether the defendant has reached a place of temporary safety is an objective [question] to be determined by the trier of fact.' " (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 113; see also *Wilkins*, *supra*, 56 Cal.4th at p. 350.)

### 2. *Standard of Review*

"A trial court must instruct the jury, even without a request, on all general principles of law that are ' "closely and openly connected to the facts and that are necessary for the jury's understanding of the case." ' " (*People v. Burney* (2009) 47 Cal.4th 203, 246 (*Burney*); see also *Cavitt*, *supra*, 33 Cal.4th at p. 204; *People v. Montoya* (1994) 7 Cal.4th 1027, 1047, 1050 (*Montoya*); *People v. Waxlax* (2021) 72 Cal.App.5th 579, 590-591.) This includes a sua sponte duty to instruct the jury on the definition of the substantive offenses charged and the elements of any applicable sentencing factors alleged. (See *People v. Sengpadychith* (2001) 26 Cal.4th 316, 327.) But, absent a close and open connection, the trial court is not "under [an] obligation to sift through the evidence to identify an issue that conceivably could have been, but was not, raised by the parties, and to instruct the jury, sua sponte, on that issue." (*Montoya*, *supra*, 7 Cal.4th at p. 1050; *People v. Wade* (1959) 53 Cal.2d 322, 334, disapproved on another ground in *People v. Carpenter* (1997) 15 Cal.4th 312, 381-382 ["the trial court cannot be required to anticipate every possible theory that may fit the facts of the case before it and instruct the jury accordingly"].) Upon request, however, the defendant has a right to an instruction that pinpoints the theory of the defense, although the trial court

13

may properly refuse such an instruction " 'if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence [citation].' " (*Burney*, *supra*, 47 Cal.4th at p. 246.)

We assess de novo whether instructions correctly state the law and whether instructions effectively direct a finding adverse to a defendant by removing an issue from the jury's consideration. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In assessing a claim of instructional error, 'we must view a challenged portion "in the context of the instructions as a whole and the trial record" to determine " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." ' " (*People v. Jablonski* (2006) 37 Cal.4th 774, 831.)

Similarly, pursuant to section 1138, "when the jury 'desire[s] to be informed on any point of law arising in the case . . . the information required must be given.' However, '[w]here the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 97 (*Brooks*).) We review the legal accuracy of any supplemental instructions de novo. (See *People v. Franklin* (2018) 21 Cal.App.5th 881, 887, fn. 4; *People v. Doane* (2021) 66 Cal.App.5th 965, 980.)

### 3. *Bejarano's Challenges to the Trial Court's Instructions*

Each of Bejarano's instructional arguments shares a common premise that, on the evidence presented, the jury could reasonably have concluded that Bejarano did not actually kill Heiser and that it was Cisneros alone who killed Heiser on his solo return to the house. In Bejarano's view, if the jury believed Cisneros to be the only actual killer,[7]

---

[7] Bejarano does not contend that the jury was required to find those facts true. The factual conclusion that Bejarano seeks relies on Ortiz's testimony that Cisneros returned to Heiser's home alone and, upon his return to the getaway car, told the group that he put

14

then the jury was permitted to acquit Bejarano of felony murder on one of two alternative grounds: (1) Bejarano did not act with reckless indifference to human life; or (2) Cisneros killed Heiser only after the completion of the felonies in which Bejarano participated, not during the perpetration of those felonies. Accepting for the sake of argument Bejarano's contention that the record permitted the jury to make the foregoing factual determinations, we are not persuaded that the trial court failed to adequately instruct the jury.

### a.    *Actual Killer—Jury Question No. 1*

As to felony murder, the trial court instructed the jury using CALCRIM Nos. 540A, "Felony Murder – . . . Defendant Committed the Fatal Act," 540B, "Felony Murder –  . . . Defendant or a Perpetrator Committed the Fatal Act," and 540C, "Felony Murder – . . . Felony Was Substantial Factor in Causing Death." The 540B instruction contained four elements:  "1. The defendant committed or aided and abetted robbery or burglary;  [¶] 2. The defendant intended to commit or intended to aid and abet the perpetrator in committing robbery or burglary;  [¶] 3. If a defendant did not personally commit robbery or burglary, then a perpetrator, whom the defendant was aiding and abetting[,] committed robbery or burglary; AND  [¶] 4. While committing[] robbery or burglary, the defendant or a perpetrator caused the death of another person." The final paragraph of 540B provided:  "You may not find the defendant guilty of felony murder unless all of you agree that the defendant or a perpetrator caused the death of another. You do not all need to agree, however, whether the defendant or a perpetrator caused that death."

As to special circumstances, the trial court instructed the jury using CALCRIM No. 703, "Special Circumstances Defendant Not the Actual Killer." Through

___

Heiser "to sleep." The jury was not required to credit either Cisneros's reported statement or Ortiz's testimony that he made the statement.

that instruction, the trial court identified the elements the prosecution was required to prove to support a special circumstance finding if the defendant was not the actual killer. Among other things, 703 explains: "If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find the special circumstances true, you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime."

During deliberations, the jury submitted a written question: "For 540B, we understand the perpetrator as the 'person [who] did the act that resulted in death.' Do we have to determine if Cisneros or Bejarano[] is the perpetrator? Or can anyone be a perpetrator? Can there be more than one?" After giving counsel an opportunity to address its proposed response and without objection from defense counsel, the trial court answered the question in writing, repeating the final paragraph of CALCRIM No. 540B and adding: "For instruction 540B, to find a defendant guilty of felony murder, you do not all need to agree on a specific perpetrator, so long as all of you agree that the defendant or a perpetrator caused the death of another. There can be more than one perpetrator." The trial court concluded with two paragraphs encouraging the jury to consider all of the instructions it had been provided, underscoring the prosecution's burden of proof, and stating that the jury had to "all agree" on "a verdict of guilty or not guilty, or true or not true, on any count, special circumstance, or allegation."

Bejarano argues that the trial court's answer to the jury's question was misleading because it suggested that the individual jurors "did not even need to concern themselves with determining which of the two defendants was the direct perpetrator of Heiser's death so long as one of them was." We find nothing misleading about the answer, which accurately reflected the law.[8] It was not necessary for the jury or an individual juror, to

---

[8] Bejarano concedes that, under existing law, a true finding on the special circumstances is sufficient to support liability for felony murder. Accordingly, Bejarano does not challenge the felony-murder instruction itself; instead, he contends that the

16

decide which participant in the commission of the felony killed Heiser, given the available alternate paths to a guilty verdict for a defendant who was not the actual killer. For example, a juror could vote to convict Bejarano where that juror believed, beyond a reasonable doubt, that either Bejarano actually killed Heiser in the perpetration of a felony or that Cisneros actually killed Heiser during the perpetration of a felony in which Bejarano (1) was a participant before or during the killing; (2) was a major participant; and (3) acted with reckless indifference to human life, even if the juror could not decide which of the two scenarios was more likely. "Not only is there no unanimity requirement as to the theory of guilt, the individual jurors themselves need not choose among the theories, so long as each is convinced of guilt. Sometimes, as probably occurred here, the jury simply cannot decide beyond a reasonable doubt exactly who did what. There may be reasonable doubt that the defendant was the direct perpetrator, and a similar doubt that he was the aider and abettor, but no such doubt that he was one or the other." (*People v. Santamaria* (1994) 8 Cal.4th 903, 919; see also *People v. Potts* (2019) 6 Cal.5th 1012, 1048.)[9]

The balance of Bejarano's argument appears to be that the trial court was required to go beyond a narrow answer to the question posed in its supplemental instruction and should instead have instructed on the legal significance of the actual-killer determination to the special circumstances analysis, which is now coextensive with the felony-murder

special circumstances instruction set the bar too low, such that neither the true finding nor the underlying substantive murder conviction can be upheld on appeal. As relevant to this section, the issue raised by Bejarano on appeal is solely whether the trial court's answer to Jury Question Number 1 posed a risk of confusing the jury as to the impact the actual killer determination would have on the balance of the special circumstances analysis.

[9] Bejarano offered no authority in support of his assertion that the individual jurors must each settle on a discrete theory of liability to vote for a conviction and has not responded to contrary authority cited by the Attorney General.

law as the Legislature has since narrowed it. But the instructions the trial court had already provided, including CALCRIM No. 703, adequately addressed the impact that the actual killer determination would have on the special circumstances analysis. The trial court encouraged the jury to review all of the instructions. The trial court did not err in constraining itself to answering the question posed by the jury without rehashing all relevant instructions. (See generally, *Brooks*, *supra*, 3 Cal.5th at p. 97 [trial court acted "well within its discretion" when it decided to reread selected portions of the standard instruction where it determined that the standard instruction adequately conveyed the concept at issue].)[10]

### b. *Continuous Transaction and Escape*

In instructing the jury per CALCRIM Nos. 540A, 540B, and 540C, the trial court advised the jury that the act causing Heiser's death had to occur while the person who committed the fatal act was "committing robbery or burglary." The instructions included cross-references to the trial court's robbery and burglary instructions. Even so, the pattern instructions did not clearly articulate when, for the purposes of felony-murder liability, the person who committed the fatal act began "committing robbery or burglary" and ceased "committing robbery or burglary."[11]

---

[10] The jury in this case sent follow-up questions when necessary. It did not follow the trial court's response to Jury Question Number 1 with any further questions on the subject.

[11] The Attorney General points out that the trial court's instruction on the timing of the formation of intent for aiding abetting a robbery referred to and defined "reach[ing] a place of temporary safety[:]" "To be guilty of robbery as an aider and abettor, the defendant must have formed the intent to aid and abet the commission of the robbery before or while a perpetrator carried away the property to a place of temporary safety. [¶] A perpetrator has reached a place of temporary safety with the property if he or she has successfully escaped from the scene, is no longer being pursued, and has unchallenged possession of the property." But, like the rest of the trial court's instructions, this instruction does not directly define the temporal scope of the robbery and/or burglary for the purposes of felony-murder liability.

Bejarano contends that the trial court's instruction was inadequate because it "did not provide guidance as to *when* the felony was considered completed for purposes of felony murder." First, we reject Bejarano's framing of the claimed error as a failure to instruct on an element of the offense. The trial court provided a proper instruction on the required relationship between the felony and the murder, which relationship was an element of the crime, including that the murder had to be committed during the perpetration of the felony. Second, because Bejarano did not request a more detailed instruction in the trial court, we must assess whether the record here required the trial court to provide a more detailed instruction sua sponte. (Compare *Cavitt*, *supra*, 33 Cal.4th at p. 204 [sua sponte instruction on the logical nexus between a burglary-robbery was not required because the evidence did not raise the issue] with *Wilkins*, *supra*, 56 Cal.4th at pp. 341, 347-348 [trial court was required to give the escape rule instruction requested by the defense because the instruction was legally correct and supported by substantial evidence].) The trial court was required to do so only if the continuous transaction doctrine and the escape rule were " 'closely and openly' " connected to the facts adduced at trial and necessary for the jury's understanding of the case. (See *Montoya*, *supra*, 7 Cal.4th at pp. 1047, 1050.) In the present case, however, the connection between the theories urged on appeal and the facts adduced at trial is not so close and open that the trial court had a sua sponte obligation to instruct on the continuous transaction doctrine or the escape rule.

The present case resembles *Montoya*. There, Montoya was convicted of burglary of an inhabited dwelling, either as a direct perpetrator or as an aider and abettor. (*Montoya*, *supra*, 7 Cal.4th at p. 1031.) At trial, the prosecution adduced evidence that Montoya was aware of his codefendant's "intent to commit a burglary and formed the intent to assist him in that enterprise prior to its commencement. There [was] scant evidence to suggest it was only after [his codefendant's] departure that defendant belatedly learned a burglary was being committed." (*Id*. at p. 1048.) The defense theory

19

of the case was that Montoya did not know that his codefendant was committing a burglary—he believed that his codefendant was recovering his own items from his own apartment. (*Id*. at pp. 1049-1050.) In that context, the California Supreme Court held that the trial court had no sua sponte obligation to instruct on the precise time at which the requisite intent of an aider and abettor must have been formed, because the issue was not " 'closely and openly' " connected to the facts before it. (*Id*. at pp. 1048, 1050.)

In trial, the parties called little attention to Ortiz's testimony that Cisneros put Heiser "to sleep" when he returned to the house to recover his hat or glove. The prosecution's theory of the case was that Bejarano and Cisneros together killed Heiser, with Bejarano sitting or jumping on Heiser's back while Bejarano and Cisneros hit Heiser in a joint effort to subdue him. Bejarano's defense at trial was that there was insufficient evidence of Bejarano's participation in the underlying burglary or robbery, because Ortiz was the sole source of evidence that Bejarano ever entered Heiser's house, let alone had contact with Heiser, and her testimony as an accomplice required corroboration. This was apparent not only in closing argument but also in cross-examination of Ortiz, where Bejarano's counsel addressed her motive to falsely incriminate both Bejarano and Cisneros and the effects of her drug and prescription medication abuse on her ability to perceive and recall the events of the evening, such as her difficulty in clearly articulating what Cisneros left in the house such that he chose to go back, and the inconsistency between her trial testimony that the participants wore "white cotton" gloves, her prior statement to law enforcement that the participants did not wear gloves, and the physical evidence collected at the scene reflecting that the participants wore latex gloves. Cisneros, the only party to address Ortiz's testimony that he put Heiser "to sleep" when he returned to the house, argued in closing that the testimony was not credible.

In view of the evidence presented and the parties' framing of their respective theories of the case, the significance of the group initially reaching the car and whether it rendered Cisneros's subsequent retrieval of his hat or glove a different transaction, was

20

not " 'closely and openly' " connected with the facts and the jury's understanding of the case. As in *Montoya*, there was "scant evidence" adduced at trial that might support the new defense theory—raised for the first time on appeal—that Cisneros's reentry into the home was an independent transaction during which Heiser was killed. (See *Montoya*, *supra*, 7 Cal.4th at pp. 1048-1050.) Considering the evidence presented and the arguments advanced by the parties in the trial court, the trial court was not obligated to sift through the evidence and instruct the jury, sua sponte, on theories that the parties had either rejected or not considered. (*Id*. at p. 1050; see also *People v. Oehler* (1970) 7 Cal.App.3d 685, 688 [question "is not whether the point of law is obscure but whether its relation to the facts of the case is obscure"].)[12]

*Wilkins*, the case on which Bejarano primarily relies, is distinguishable because it does not involve the trial court's duty to provide sua sponte instructions. There, Wilkins stole items from a house in Menifee, California and put them in the bed of his truck, with the tailgate down. (*Wilkins*, *supra*, 56 Cal.4th at p. 338.) While he was driving on the freeway, a stolen stove fell off the bed of his truck. (*Ibid*.) A motorist who later swerved to avoid the stove died. (*Id*. at p. 339.) The trial court refused a defense request to provide an instruction on the escape rule. (*Id*. at p. 341.) The California Supreme Court held that the trial court's refusal was prejudicial error. (*Id*. at pp. 347-351.) Because, even under the prosecution theory of the case, Wilkins had been driving at normal speeds on the freeway for more than an hour without pursuit and was 62 miles away from the

---

[12] In finding the special circumstances true, the jury necessarily rejected Bejarano's factual theory by determining that Bejarano was either an actual killer or a major participant in the underlying felonies who acted with reckless indifference to human life. We cannot reconcile these jury findings, in the context of the whole record presented, with a contrary determination on the "in perpetration of" element predicated on the proposition that, based on Ortiz's testimony that Cisneros went back and reportedly hit Heiser one more time, the attack in which Bejarano participated was not a substantial factor in causing Heiser's death. (See, generally, *People v. Garcia* (2022) 82 Cal.App.5th 956, 963 [discussing proximate causation in the felony-murder context].)

scene of the burglary when the stove fell out of his truck, the court explained that "reasonable trier of fact could have concluded either that defendant had reached a place of temporary safety before the fatal act occurred, or that he had not." (See *id*. at p. 350; see *id*. pp. 347-348, 350-351.) Setting aside the factual differences between *Wilkins* and the present case, *Wilkins* was decided under a different standard. There, the question was whether there was substantial evidence for the requested instruction on general legal principles; here the question is whether the general legal principles were closely and openly connected to the facts before the trial court and necessary for the jury's understanding of the case that the trial court was required to instruct the jury on them without a request. (See *id*. at pp. 341, 347-348.)[13] Accordingly, nothing in *Wilkins* disturbs our conclusion that the trial court was not required, absent a request, to instruct the jury on the continuous transaction doctrine or escape rule.

### c. *Reckless Indifference to Human Life*

The trial court instructed the jury on the essential elements for a special circumstances finding in connection with a felony murder conviction, where the defendant is not the actual killer, using CALCRIM No. 703. As set forth in the instruction, the three essential elements are: (1) the defendant's participation in the crime began before or during the killing; (2) the defendant was a major participant in the crime; and (3) when the defendant participated in the crime, the defendant acted with reckless indifference to human life.

Addressing the special circumstances statute, the California Supreme Court explained that "the generally accepted meaning of the phrase, 'reckless indifference to human life,' in common parlance amply conveys to the jury the requirement of a defendant's subjective awareness of the grave risk to human life created by his or her

---

[13] Similarly, *People v. Salas* (2006) 37 Cal.4th 967, 982-983, which Bejarano cites for the first time in his reply brief, is inapposite because it concerns the trial court's obligation to instruct on affirmative defenses.

22

participation in the underlying felony.  This is the meaning intended by the phrase 'reckless indifference to human life' as it is used in [the special circumstances statute.] The phrase therefore does not have a technical meaning peculiar to the law, and the trial court had no sua sponte duty to further define the statutory phrase for the jury."  (*People v. Estrada* (1995) 11 Cal.4th 568, 578 (*Estrada*).)

In two subsequent opinions addressing sufficiency of the evidence challenges, *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), the California Supreme Court discussed factors relevant to assessing whether a defendant acted with reckless indifference to human life.  (See *People v. Price* (2017) 8 Cal.App.5th 409, 447-451 (*Price*).)

In *Banks*, the court held that an individual who had driven the getaway car in connection with the armed robbery of a marijuana dispensary, but who was not present at the scene when the robbery took place and who had not participated in planning or procuring weapons, was not a "major participant."  (See *Banks*, *supra*, 61 Cal.4th at pp. 804-807; see also *Price*, *supra*, 8 Cal.App.5th at p. 448.)  Further, there was insufficient evidence to support a finding of reckless indifference.  (See *Banks*, *supra*, 61 Cal.4th at pp. 807-811; see also *Price*, *supra*, 8 Cal.App.5th at p. 448.) "[T]here was no evidence that appellant 'knew that his own actions would involve a grave risk of death,' 'intended to kill' or 'knowingly conspired with accomplices known to have killed before.' "  (*Price*, *supra*, 8 Cal.App.5th at p. 448, quoting *Banks*, *supra*, 61 Cal.4th at p. 807.)  The killing was "apparently a spontaneous response to armed resistance from the victim," which was not anticipated.  (*Banks*, *supra*, 61 Cal.4th at p. 807; see *id*, at p. 811.)

The *Banks* Court provided a series of "factors" that "may play a role in determining whether a defendant's culpability is sufficient to make [the defendant] death eligible" as a major participant.  (*Banks*, *supra*, 61 Cal.4th at p. 803.)  The factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?

23

What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did [the defendant's] own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Ibid*., fn. omitted.) "No one of [the] considerations" set forth in *Banks* "is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered major [citation]." (*Ibid*.)

The following year, the *Clark* Court concluded that there was insufficient evidence to support a finding that a defendant who participated in an armed robbery acted with reckless indifference to human life, where there was only one gun loaded with one bullet at the scene and the defendant, who was not carrying the gun and who planned the robbery in a way that was intended to minimize the risk of violence, was waiting for the shooter on the other side of a parking lot when the killing took place. (*Clark*, *supra*, 63 Cal.4th at pp. 618-623; *Price*, *supra*, 8 Cal.App.5th at p. 449.) In *Price*, the Court of Appeal read *Banks* and *Clark* to "indicate the felony-murder special circumstance may not lightly be applied to every participant in a felony murder and that the evidence required to meet the major participant and reckless indifference elements in the case of a nonkiller must reflect a high degree of culpability." (*Price*, *supra*, 8 Cal.App.5th at p. 451; see also *People v. Strong* (2022) 13 Cal.5th 698, 719-720 (*Strong*).)

Prior to the trial in this case, CALCRIM No. 703 was revised to include optional language discussing the *Banks* "major participant" factors. In its present form, CALCRIM No.703 also includes optional language addressing the "reckless indifference" factors, derived from *Clark*. (CALCRIM No. 703 (2022 ed.).) As to reckless indifference, the optional language addresses the defendant's knowledge about the number of weapons, if any, that would be present and the likelihood that they would

24

be, or were, used; the defendant's knowledge about coparticipant's propensity for violence; the duration of the crime; and the defendant's proximity to, and ability to prevent or reduce the likelihood of, the killing. (*Ibid.*)

The trial court's instruction in this case provided the optional instruction addressing the major participant factors listed in *Banks*, but not the subsequently added optional language addressing the reckless indifference factors derived from *Clark*. Bejarano contends that the failure to provide a sua sponte instruction on the reckless indifference factors was error. As Bejarano acknowledges, the Courts of Appeal in *Price* and *People v. Allison* (2020) 55 Cal.App.5th 449 (*Allison*)[14] have both concluded, consistent with the bench notes appended to the current CALCRIM No. 703 instruction, that trial courts are not required to include the optional language discussing the *Banks* and *Clark* factors without a request to do so. (See *Price*, *supra*, 8 Cal.App.5th at p. 451; *Allison*, *supra*, 55 Cal.App.5th at p. 458 [acknowledging that CALCRIM No. 703 has been updated to include optional language in light of *Banks* and *Clark*, but concluding that the optional language does not materially change the instruction]; see also *Strong*, *supra*, 13 Cal.5th at p. 719-720 [acknowledging that the mandatory instructions did not change after *Banks* and *Clark*, but noting that the availability of optional instructions may influence trial strategies and encourage counsel to request the optional instructions].) We decline to break with *Price*, which we find well reasoned.

Fundamentally, the *Price* Court determined that *Estrada* remains binding precedent for the proposition that trial courts have no sua sponte obligation to instruct on the jury on the phrase " ' "reckless indifference to human life" ' " because the phrase is intended to be defined as used in common parlance. (*Price*, *supra*, 8 Cal.App.5th at p. 450; see *id*. at p. 451.) Although subsequent Supreme Court decisions have focused

---

[14] After briefing was completed, the California Supreme Court disapproved of *Allison* on another ground. (See *Strong*, *supra*, 13 Cal.5th at p. 718, fn. 3.)

25

the inquiry on certain factors to focus the analysis, and optional instructions have been created to do the same where requested, the holding in *Estrada* has not been abrogated. (See, generally, *Strong*, *supra*, 13 Cal.5th at pp. 705-707, 719-720 [noting the holding in *Estrada*; describing how *Banks* and *Clark* changed the legal landscape without causing a change in the mandatory instructions].) Accordingly, we follow it here—the trial court was not required to provide an instruction explaining the phrase "reckless indifference to human life" where no explanation was requested.[15]

### 4. *Ineffective Assistance of Counsel*

To the extent the court was not required to give the instructions Bejarano now argues were appropriate without a request from his trial counsel, Bejarano contends that his trial counsel rendered ineffective assistance by failing to make the request. As discussed below, Bejarano has not demonstrated ineffective assistance of counsel through this direct appeal.

"A criminal defendant's federal and state constitutional rights to counsel [citations] include[] the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under

---

[15] Bejarano's primary argument is that *Estrada* is no longer good law after the decisions in *Banks* and *Clark*—*Banks* and *Clark* have redefined "reckless indifference to human life" to have a technical meaning. We disagree, the guidance on the types of evidence that would sustain a "reckless indifference" finding does not abrogate the holding in *Estrada*. (See *Strong*, *supra*, 13 Cal.5th at pp. 705-707 [discussing the evolution of the body of law].) In the alternative, Bejarano argues that even if *Estrada* remains the law insofar as "reckless indifference to human life" has a non-technical meaning that "does not need further definition," the trial court still had a "duty to provide the jury with all relevant considerations it needs to make its decision." But if the jury knows what reckless indifference to human life means based on its common usage, then the jury does not "need[]" the term to be explained. Of course, an explanation may be beneficial—there is an optional instruction that may be requested.

26

prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim for ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

In this direct appeal, Bejarano contends that there can be no satisfactory explanation for trial counsel's failure to request instructions on the one continuous transaction doctrine, the escape rule, and the *Clark* factors and a response to Jury Question Number 1 that laid out the impact a determination that Bejarano was not the actual killer would have on the pathway to a true finding on the felony-murder special circumstance allegations. Bejarano has not met the "particularly difficult" standard for reversal on direct appeal.

As to the failure to request additional instructions on general legal principles, Bejarano acknowledges that his trial strategy was "to convince the jury that the outcome of the trial hinged on the believability of Gabriela Ortiz and to make the case for why she should not be believed," a strategy that he "does not challenge." Implicitly acknowledging that the instructions he now seeks would not further the theory that he never entered Heiser's house, he argues that counsel should have requested the instructions to create an alternative pathway to at least resist the special circumstances allegations.

27

In hindsight, Bejarano argues that there can be no satisfactory explanation for the failure to raise these alternative arguments because "the defense had nothing to lose." Trial counsel could have reasonably concluded that Bejarano had much to lose by muddying the waters with alternative arguments. Each step he took towards conceding the veracity of Ortiz's testimony, in the context of the physical evidence collected at the scene, took him closer to a version of events in which Bejarano was the primary killer because he caused Heiser to asphyxiate by jumping on Heiser from the doorway and sitting on Heiser's back while Heiser was face down on his bed, being beaten and bound by Cisneros. Trial counsel could reasonably have decided that it would undermine Bejarano's primary objective to contest whether the conduct described by Ortiz evinced a reckless indifference to human life or whether, solely on the strength of Ortiz's testimony, Heiser was killed only after the underlying felonies had concluded.[16] Even if trial counsel believed otherwise, we are unable on this record to rule out the possibility that Bejarano precluded trial counsel from conceding participation even in the predicate felony offenses. (See, e.g., *McCoy v. Louisiana* (2018) 138 S.Ct. 1500, 1509; *People v. Bloom* (2022) 12 Cal.5th 1008, 1039 ["the decision whether to concede the defendant should be found guilty of . . . even a lesser crime than the one the prosecution charged . . . necessarily belongs to the defendant"].) Bejarano has not demonstrated the absence of a rational explanation for trial counsel's failure to pursue the theory that he participated in a home-invasion robbery only up until he reached the getaway car, or only without reckless indifference to human life, and was therefore not liable for a killing attributable only to Cisneros.

---

[16] In denying a new trial motion in which Bejarano first raised a claim of ineffective assistance, the trial court observed that counsel "was very focused on the issues that trial counsel felt or at least from the Court's perspective perceived to feel gave Mr. Bejarano the best chance of being acquitted, particularly of the homicide charge."

As to the failure to seek a more detailed response to Jury Question Number 1, as discussed above, no more detailed response was called for. The jury had already been provided an instruction explaining the elements required to find the special circumstances true if, under then-existing law, it determined that Bejarano was guilty of felony murder but was not the actual killer. The answer to Jury Question Number 1 directed the jurors to review all of the instructions they had been given. Moreover, as discussed above, to the extent that Bejarano contends that individual jurors had to select a single theory of liability, we reject that contention.

## B. Brady *Error*

Bejarano argues that the prosecution violated his right to due process of law under *Brady* by failing to timely disclose the Jorden memos. Accepting that the Jorden memos were favorable to the accused as impeachment evidence relating to a prosecution witness and were suppressed by the state, we conclude that no *Brady* violation occurred here because, on the facts of this case, the Jorden memos were not material.

### 1. *Legal Principles*

Pursuant to *Brady* and its progeny, the accused's constitutional right to due process of law requires the prosecution to disclose evidence that is " 'favorable to [the] accused' and 'material to either guilt or punishment.' " (*Association for Los Angeles Deputy Sheriffs v. Superior Court* (2019) 8 Cal.5th 28, 40 (*Los Angeles Deputy Sheriffs*) [quoting *Brady*, *supra*, 373 U.S. at p. 87]; *People v. Superior Court (Johnson)* (2015) 61 Cal.4th 696, 709.) "Such disclosure may be required even if the prosecutor is not personally aware that the evidence exists." (*Los Angeles Deputy Sheriffs, supra*, 8 Cal.5th at p. 36.) "[F]avorable" evidence includes evidence that would impeach a prosecution witness. (*Id.* at p. 40.) "Evidence is material ' "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' [Citation.] Evaluating materiality requires consideration of the collective significance of the undisclosed evidence [citation], as well

29

as 'the effect of the nondisclosure on defense investigations and trial strategies [citation]. [Citations.] 'A reasonable probability does not mean that the defendant "would more likely than not have received a different verdict with the evidence," only that the likelihood of a different result is great enough to "undermine[] confidence in the outcome of the trial." ' [Citation.]" (*Los Angeles Deputy Sheriffs*, 8 Cal.5th at p. 40; see also *People v. Deleoz* (2022) 80 Cal.App.5th 642, 656.)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176 (*Letner and Tobin*); see also *People v. Wilson* (2020) 56 Cal.App.5th 128, 160.)

### 2. *Materiality*

Bejarano argues that Jorden's testimony, together with Ortiz's testimony that Bejarano pinned Heiser by sitting on his back, tended to implicate Bejarano as a direct perpetrator of Heiser's death because Jorden identified asphyxiation as a cause of death. Bejarano contends that if the Jorden memos had been available to him, he would have been able to call Jorden's determination that Heiser died as a result of asphyxiation into question, strengthening his arguments that his liability had to be assessed as a nonkilling accomplice rather than a direct perpetrator. But, taking into account the facts of this case and the subject matter of the Jorden memos, we are not persuaded that the provision of the Jorden memos would create a reasonable probability of a different result.

Jorden's opinion in this case did not exist in a vacuum. Jorden's opinion was rendered based on the state of Heiser's body at the time of autopsy, which was documented in contemporaneous photographs and by a medical examiner at the scene. Bejarano has raised no question as to the foundation for Jorden's opinion: there is no dispute that, for example, Heiser's body exhibited bruising and petechial hemorrhages, as confirmed by both Jorden and the medical examiner who reported to the scene, or that Heiser had an enlarged heart. Nor has Bejarano suggested that he could or would adduce

30

evidence that, for example, petechial hemorrhaging is not a sign of asphyxia or that an enlarged heart is not a sign of heart failure. Bejarano's trial counsel had an opportunity to evaluate the nexus between Jorden's opinions and the factual record without receiving the Jorden memos.

To be sure, the Jorden memos could be used to challenge Jorden's opinions indirectly by challenging her motives. But even in that usage, Jorden's motives as identified in the Jorden memos are not easy to transpose in the present case. The Jorden memos identify two cases. Both cases involved Jorden's concern that law enforcement did not immediately treat the deaths of children in suspicious circumstances as homicides and resulting conflicts between Jorden, in her perceived role as an "advocate for victims," and law enforcement. The present case did not present similar issues—Heiser's death was indisputably a homicide, the question at trial was who would be liable. Bejarano has identified no alternative explanation, aside from the cause of death proffered by Jorden, that fits with the facts of this case as illustrated by the physical evidence and testimony adduced at trial. Accepting that the defense could have attempted to paint Jorden as a biased medical examiner attempting to secure a conviction, the prospect of such an effort does not—on this record—undermine our confidence in the outcome of the trial. (See *Letner and Tobin*, *supra*, 50 Cal.4th at p. 177 [" ' "In general, impeachment evidence has been found material where the witness at issue 'supplied the only evidence linking the defendant(s) to the crime' [citations], or where the likely impact on the witness's credibility would have undermined an element of the prosecution's case [citation]." ' "].)

## C. *Equal Protection*

Bejarano, who was 22 years old at the time of the offenses, contends that his LWOP sentence violates his right to equal protection under the United States and California Constitutions because section 3051 grants youthful offender parole hearings to individuals who are subject to de facto LWOP sentences for offenses committed before the age of 26, and there is no sufficient justification to treat similarly youthful offenders

31

who are subject to true LWOP sentences differently.  Consistent with the majority of the published authority addressing the issue, we conclude that there is a rational basis for the distinctions drawn by the Legislature in section 3051.  Accordingly, we reject Bejarano's constitutional challenge to his sentence.[17]

### 1. *Legal Principles*

"Both the federal and California Constitutions guarantee that no person shall be denied the equal protection of the laws.  (U.S. Const., 14th Amend.; Cal Const., art. I, §-7.)" (*People v. Hardin* (2022) 84 Cal.App.5th 273, 282-283, review granted Jan. 11, 2023, S277487 (*Hardin*).)  Our evaluation of Bejarano's constitutional claim proceeds in two steps:  "First, we consider whether ' "the state has adopted a classification that affects two or more similarly situated groups in an unequal manner." ' [Citation.] . . . Second, if two similarly situated groups have been identified and no suspect class or fundamental rights are at issue, we must decide whether there is any rational basis to support treating the groups differently.  [Citation.]" (*Sands*, *supra*, 70 Cal.App.5th at p. 202.)

" ' "[R]ational basis" scrutiny is exceedingly deferential:  A law will be upheld as long as a court can "speculat[e]" any rational reason for the resulting deferential treatment, regardless of whether the "speculation has 'a foundation in the record,' " regardless of whether it can be "empirically substantiated," and regardless of whether the Legislature ever "articulated" that reason when enacting the law.' " (*People v. Jackson* (2021) 61 Cal.App.5th 189, 196 (*Jackson*).)  "As a result, '[t]o mount a successful

---

[17] The People argue that Bejarano forfeited his equal protection claim by failing to raise it in the trial court.  Bejarano maintains that even if his claim were forfeited we retain discretion to consider the pure question of law and, alternatively, his counsel was ineffective in failing to raise it.  In light of our determination of the merits, which turns on a constitutional analysis ordinarily conducted independently (*People v. Sands* (2021) 70 Cal.App.5th 193, 202 (*Sands*)), we need not address the forfeiture and ineffective assistance of counsel arguments.

rational basis challenge, a party must " 'negative every conceivable basis' " that might support the disputed disparity.' " (*People v. Morales* (2021) 67 Cal.App.5th 326, 344 (*Morales*).)

## 2. *Unequal Treatment of One or More Similarly Situated Groups*

In addressing whether groups are similarly situated for equal protection purposes, "the pertinent question . . . is whether the . . . groups are properly distinguishable for purposes of the law being challenged, even if they are dissimilar for other (or even most) purposes." (*Hardin*, *supra*, 84 Cal.App.5th at p. 287, review granted.)

Section 3051 "provides an opportunity for release (via youth offender parole hearings" to most persons convicted of crimes committed before the age of 26 in their 15th, 20th, or 25th year of incarceration, depending on the sentence imposed for their ' "[c]ontrolling offense." ' " (*Sands*, *supra*, 70 Cal.App.5th at p. 198.) But "[t]he process is unavailable to offenders 'sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age.' " (*Id*. at p. 199, italics removed.)

As it relates to all non-LWOP sentences, section 3051 was intended to permit "a determination whether a person who committed a serious or violent crime between the age of 18 and 25 has sufficiently matured and outgrown the youthful impulses that led to the commission of the offense"; the Legislature enacted section 3051 "in light of neuroscience research that demonstrated the human brain continues to develop into a person's mid-20's." (*Hardin*, *supra*, 84 Cal.App.5th at pp. 287-288, review granted; see also *People v. Acosta* (2021) 60 Cal.App.5th 769, 776-777 (*Acosta*).) As it relates to individuals subject to LWOP sentences for controlling offenses committed prior to the age of 18, the statute was intended to " 'bring California into compliance with the constitutional requirements of [United States Supreme Court decisions]' " by " 'remedy[ing] now unconstitutional juvenile sentences of life without the possibility of parole,' without the need for 'a resentencing hearing, which is time-consuming,

expensive, and subject to extended appeals.' " (*Acosta*, *supra*, 60 Cal.App.5th at p. 777; see also *In re Williams* (2020) 57 Cal.App.5th 427, 433 (*Williams*); *Sands*, *supra*, 70 Cal.App.5th at p. 198.)

"[S]ection 3051 'permit[s] the reevaluation of the fitness to return to society of persons who committed serious offenses prior to reaching full cognitive and emotional maturity,' unless the person was 'between 18 and 25 years of age when they committed their offense [and] were sentenced to life without the possibility of parole.' [Citation.] It therefore 'distinguishes both between those who committed their offenses under 18 years of age and those between 18 and 25 years of age, and between offenders 18 to 25 years of age sentenced to prison terms with the possibility of parole and those in the same group who have been sentenced to life without the possibility of parole.' " (*Acosta*, *supra*, 60 Cal.App.5th at p. 777.)

We assume that individuals who are subject to LWOP sentences for controlling offenses committed between the ages of 18 and 25 are similarly situated with individuals who are subject LWOP sentences for controlling offenses committed prior to the age of 18 and individuals who are subject to de facto LWOP sentences for controlling offenses committed between the ages of 18 and 25. (See *Sands*, *supra*, 70 Cal.App.5th at p. 203 [making same assumption]; see also *Morales*, *supra*, 67 Cal.App.5th at p. 347 [similar assumptions]; compare *Acosta*, *supra*, 60 Cal.App.5th at p. 778; see *id*. at p. 779 ["young adult LWOP offenders are similarly situated to young adult offenders sentenced to life and juvenile offenders sentenced to life or LWOP . . . for the purpose of section 3051"]; *Hardin*, *supra*, 84 Cal.App.5th at pp. 287-288, review granted [young adult LWOP offenders are similarly situated with all other young adult offenders for the purposes of section 3051]; *Jackson*, *supra*, 61 Cal.App.5th at pp. 201-202 (conc. opn. of Dato, J.); with *Jackson*, 61 Cal.App.5th at p. 199 [young adult LWOP first degree murderers and other young adult first degree murderers are not similarly situated because LWOP

34

offenses carry a greater degree of culpability]; *Williams*, *supra*, 57 Cal.App.5th at pp. 434-436.)

### 3. *Rational Basis Review*

Rational basis review applies where a " ' " 'statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights.' " ' " (*Hardin*, *supra*, 84 Cal.App.5th at p. 284, review granted.) "Where a class of criminal defendants is similarly situated to another class of defendants who are sentenced differently, courts look to determine whether there is a rational basis for the difference." (*People v. Edwards* (2019) 34 Cal.App.5th 183, 195; *Acosta*, *supra*, 60 Cal.App.5th at p. 778.) Each court to address an analogous equal protection challenge to section 3051 has applied the rational basis standard. (See *Hardin*, *supra*, 84 Cal.App.5th at pp. 284-285, review granted; *Acosta*, *supra*, 60 Cal.App.5th at pp. 779-781; *Sands*, *supra*, 70 Cal.App.5th at pp. 203-205; *Williams*, *supra*, 57 Cal.App.5th at pp. 433-436; *Jackson*, *supra*, 61 Cal.App.5th at pp. 199-200; *Morales*, *supra*, 67 Cal.App.5th at pp. 347-349; *In re Murray* (2021) 68 Cal.App.5th 456, 462-465 (*Murray*).) We do the same.

Bejarano correctly does not dispute that there is a rational basis for differential treatment between juveniles subject to LWOP sentences and young adults subject to LWOP sentences. (See, e.g., *Murray*, *supra*, 68 Cal.App.5th at pp. 463-464; *Hardin*, *supra*, 84 Cal.App.5th at pp. 285-286, review granted.) Accordingly, we focus our attention on his contention that there is no rational basis for distinguishing between young adults with LWOP sentences and individuals of the same age with de facto LWOP sentences.

Several courts have concluded that there is a rational basis for the statutory distinction, reasoning as follows. LWOP sentences are prescribed by California law for crimes the Legislature has determined are so serious " 'as to warrant a sentence that carries no hope of release for the criminal and no threat of recidivism for society.' " (*Sands*, *supra*, 70 Cal.App.5th at p. 204; *Acosta*, *supra*, 60 Cal.App.5th at p. 780.) Thus,

several courts have held that there is a rational basis to treat LWOP offenders more harshly than their counterparts, their offenses are more grave. (*Sands*, *supra*, 70 Cal.App.5th at p. 204-205; *Acosta*, *supra*, 60 Cal.App.5th at p. 780; *Williams*, *supra*, 57 Cal.App.5th at p. 436; *Morales*, *supra*, 67 Cal.App.5th at p. 349; *Jackson*, *supra*, 61 Cal.App.5th at pp. 199-200.)

More recently, the *Hardin* court charted a different course. The court questioned "the premise that assessing relative culpability has a proper role in a statute expressly intended to recognize the diminished culpability of youthful offenders based on their stage of cognitive development." (*Hardin*, *supra*, 84 Cal.App.5th at p. 289, review granted.) Accepting the premise, the *Hardin* court parted company with prior decisions for three related reasons. First, the *Hardin* court reasoned that the statutory distinction could not be explained by the relative level of culpability because there is no meaningful difference in the level of culpability of a person who has been sentenced to LWOP for a single offense and a person who has received a de facto LWOP sentence for the commission of multiple violent crimes. (*Ibid.*) Second, the *Hardin* court stated that "the Legislature eschewed any attempt to assess the offenders' overall culpability" "[b]y defining the youth parole eligible date in terms of a single 'controlling offense,' rather than the aggregate sentence." (*Ibid.*) Third, the *Hardin* court explained that the difference between a first degree murder subject to a life sentence with the possibility of parole and a special circumstances first degree murder subject to LWOP is "illusory" because special circumstances allegations can be included in most cases, "leaving the decision of whether a [LWOP] sentence may be imposed to the discretion of local prosecutors." (*Id.* at p. 290.)

We respect the *Hardin* court's incisive criticism of the differential treatment imposed by section 3051, as a matter of public policy and youthful brain development. But we find the majority of the published opinions addressing the equal protection issue persuasive. Operating in tandem with sentencing statutes, section 3051 implicates the

36

broad legislative authority to prescribe a graduated system of punishment that in its collective judgment—itself the subject of compromise—balances the often messy agglomeration of disparate factors relevant to criminal sentencing. We are unable to conclude that the distinctions codified in section 3051 represent an irrational exercise of legislative power.

First, section 3051 reflects a rational legislative effort to tie both the timing and availability of a youth offender parole hearing to the "offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (See § 3051, subds. (a)(2)(B), (b)(1)-(4), (h).) Although section 3051 is not itself a sentencing statute, it is part of a body of law that potentially mitigates the maximum sentence for youth offenders who commit certain offenses at 25 or younger. Policy considerations such as severity, deterrence, retribution, and incapacitation are salient in this context, even though culpability may be lower for young adults than older adults. (See *Sands*, *supra*, 70 Cal.App.5th at p. 205.)

Reasonable minds may legitimately reject the wisdom of using the longest available maximum term of imprisonment as a proxy for a young person's degree of incorrigibility. But we are unable to say that the Legislature's resort to this deciding factor lacks any rational basis. Even accepting, as we do, that as with Ortiz, Bejarano's still-developing capacity for judgment, restraint, and respect for life influenced his role in Heiser's death, the Legislature may rationally decide to consign even youthful offenders over the age of 18 to mandatory LWOP sentences, by virtue of their controlling offense.

Second, although we recognize the troubling implications of the statutory scheme, we do not believe these are sufficient to allow us to override the judgment of the Legislature on an equal protection challenge. "[T]he Legislature expressly recognized that cognitive brain development continues into the early 20s or later, and the parts of the brain that are still developing during this process affect judgment in ways that are highly relevant to criminal behavior. Since the Legislature has determined a 17-year-old who is

37

sentenced to life or LWOP for committing a crime when his or her brain is not yet fully developed should receive a youth offender parole hearing . . ., a 21-year-old sentenced to LWOP for committing a crime when his or her brain is not yet fully developed should arguably receive the same hearing.  We are also mindful of the public policy purpose of the statute, which is to permit the eventual evaluation of a young offender who committed a serious offense before reaching full cognitive and emotional maturity with an eye toward determining whether that individual has become fit to return to society.  Arguably an LWOP offender and a non-LWOP offender are equally capable of gaining maturity, so we question whether the exclusion for young adult LWOP offenders from this process is consistent with the statute's purpose and legislative history." (*Acosta*, *supra*, 60 Cal.App.5th at pp. 780-781; see also *Murray*, *supra*, 68 Cal.App.5th at p. 464; *Morales*, *supra*, 67 Cal.App.5th at p. 349.)  But "[t]he Legislature's distinction is not irrational simply because *some* offenders sentenced to life without the possibility of parole are arguably less culpable than *some* offenders receiving lesser sentences.  A legislative classification does not fail rational basis review because it is ' "imperfect" ' or ' "because it may be 'to some extent both underinclusive and overinclusive.' " ' " (*Sands*, *supra*, 70 Cal.App.5 that pp. 204-205.)

Consistent with the foregoing, we reject Bejarano's equal protection challenge to his sentence predicated on his equal protection challenge to section 3051, pending further guidance from the California Supreme Court or the Legislature.  (See, e.g., *Murray*, *supra*, 68 Cal.App.5th at pp. 464-465 ["encouraging the Legislature to revisit where it has drawn the line with section 3051, subdivision (h), and to reconsider whether a youthful offender who was sentenced to LWOP for a crime committed at an age while cognitive brain development was still ongoing should be afforded the possibility of release like those under 18 years old at the time of their offense"]; see also *Morales*, *supra*, 67 Cal.App.5th at p. 349; *Acosta*, *supra*, 60 Cal.App.5th at p. 781.)

38

**D.**     *Other Issues*

At least assuming that we otherwise uphold the judgment, the parties agree that the portions of the judgment requiring Bejarano to pay any balance associated with the $129.75 criminal justice administration fee pursuant to Government Code section 29550.2 that remained unpaid as of July 1, 2021 and the $300 parole revocation fine pursuant to section 1202.45 should be vacated. Having otherwise upheld the judgment, we vacate the judgment as to the fine and fee at issue. (See *People v. Greeley* (2021) 70 Cal.App.5th 609, 625-627; *People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6.)

## III.    DISPOSITION

The trial court's imposition of the $129.75 criminal justice administration fee pursuant to Government Code section 29550.2 is modified to vacate any portion of that amount that remained unpaid as of July 1, 2021. The trial court's imposition of the $300 parole revocation fine pursuant to section 1202.45 is vacated. In all other respects, the judgment is affirmed. The trial court shall prepare an amended minute order and abstract of judgment to reflect the vacatur of the unpaid balance of the criminal justice administration fee and the parole revocation fine.

_____
LIE, J.

WE CONCUR:

_____
GREENWOOD, P.J.

_____
GROVER, J.

*People v. Bejarano*
H047892